# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re

**HAMAYAG S. TAVITIAN,**                              Chapter 7
    Debtor                                   Case No. 16-13829-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**KARIM DEGHMANE,**
    Plaintiff
v.                                                   Adv. P. No. 16-1191
**HAMAYAG S. TAVITIAN,**
    Defendant, Plaintiff in Counterclaim
    and Third Party Plaintiff
v.

**KARIM J. DEGHMANE,**
    Defendant in Counterclaim
and
**CARLO CELLAI, Esq.** and
**CELLAI LAW OFFICES, P.C.**
    Third Party Defendants

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matters before the Court are Counts I, II, and III of the "Complaint to Determine Dischargeability" filed by the Plaintiff, Karim J. Deghmane (the "Plaintiff"), against Hamayag S. Tavitian (the "Defendant" or the "Debtor"). The Court previously dismissed Counts IV and V of the Plaintiff's Complaint, as well as the Defendant's

1

Counterclaims against the Plaintiff and his Third Party Claims against the Plaintiff's attorney, Carlo Cellai, Esq., and the law firm of Cellai Law Offices, P.C.

The Court conducted a trial on April 10, 2018 with respect to the remaining counts of the Complaint pursuant to which the Plaintiff seeks to except a debt from discharge under 11 U.S.C. § 523(a)(2), (a)(4), and (a)(6) (Counts I-III).  Through Count VI, the Plaintiff seeks damages under Mass. Gen. Laws ch. 93A.  At the conclusion of the trial, the Court directed the parties to submit proposed findings of fact and conclusions of law by June 1, 2018.  The Plaintiff complied with the Court's directive on May 10, 2018.  The Defendant failed to submit proposed findings of fact and conclusions of law by the June 1, 2018 deadline.

Prior to the commencement of the Debtor's bankruptcy case on October 4, 2016, the Plaintiff obtained a default judgment from the Cambridge District Court Department of the Massachusetts Trial Court against the Defendant on October 26, 2012 in a civil action for damages for breach of contract, quantum meruit, Ch. 93A, conversion, and breach of the implied covenant of good faith and fair dealing.[1]  The debt the Plaintiff seeks to except from the Debtor's discharge in his bankruptcy case is that default judgment.

---

[1] The Court notes that the Plaintiff in his Complaint filed in this Court represented that he obtained "a Judgment *on the merits* for Violations of Unfair and Deceptive Acts, under M.G.L. 93a [sic]." (emphasis supplied).  The Plaintiff did not introduce a copy of the state court complaint as an exhibit although he did introduce at trial a certified copy of the "Judgment for Plaintiff(s) by Default" which reveals that the Plaintiff was awarded double damages, costs, and attorney's fees in the total amount of $47,651.79.

At trial, the Plaintiff and the Defendant were the only witnesses to testify. The parties introduced a total of twelve exhibits into evidence. The issue presented is whether the Plaintiff sustained his burden of proof that the debt owed to him by the Defendant is excepted from discharge.

## II. BACKGROUND[2]

The Debtor filed a voluntary Chapter 7 petition on October 4, 2016. He listed the Plaintiff as the holder of a nonpriority unsecured claim in the sum of $48,498.37 and nonpriority unsecured debts totaling $125,379.38. He listed his occupation as a driver for Lyft, Inc. In his Statement of Financial Affairs, he disclosed that he formerly was self-employed in a jewelry design business known as "Design by Hamo."

On January 11, 2017, the Chapter 7 trustee filed a Report of No Distribution. Approximately three months later, the order of discharge entered discharging the Debtor from all debts other than those excepted from discharge. The Plaintiff timely commenced the instant adversary proceeding seeking to except from the Debtor's discharge the amount of his state court default judgment. The Defendant failed to comply with discovery requests in the adversary proceeding, and, as noted above, failed to submit post-trial proposed findings of fact and conclusions of law.

---

[2] The Court may take judicial notice of its own docket. *See* LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir. 1999) ("The bankruptcy court appropriately took judicial notice of its own docket.").

## III. FACTS

The Plaintiff, a real estate developer, testified that he initially met the Defendant at a cigar shop on Mount Auburn Street in Watertown, Massachusetts that they both frequented.  The Plaintiff stated that in the early fall of 2011 he gave a diamond to the Defendant to sell.  The Plaintiff had acquired the diamond from a gemologist by the name of Stephanie A. Lyon and paid $13,660.50 for it.  The receipt from the seller, dated September 21, 2005, reflects that the diamond was a princess cut, weighed 1.55 carats, and had a "VS2 clarity," an "E color," and a $20,000 replacement value.

According to the Plaintiff, the Defendant represented that he was a jeweler, that he made and sold jewelry, and that he worked with other jewelers in Boston, Massachusetts and environs.  The Plaintiff testified that he informed the Defendant that he was prepared to sell the diamond for $8,000 and the Defendant agreed to sell it, assuring him that "he could move [the diamond] fairly quickly given the quality and the price that I was prepared to sell it for."  Indeed, the Plaintiff stated that the Defendant told him that he could sell the diamond in a matter of days or weeks.  The Plaintiff further testified that the Defendant's compensation for his sales efforts would be "whatever Mr. Tavitian was able to make beyond that $8,000."

The parties had no written agreement regarding the sale of the diamond in the early fall of 2011.  After several weeks passed, however, the Plaintiff became apprehensive about the Defendant's failure to promptly sell the diamond and began calling the Defendant and sending him text messages.  According to the Plaintiff, he did not know where the diamond was until late November, although the Defendant

4

represented that "there was movement on the sale of the diamond and that I had no reason for concern." Nevertheless, the Plaintiff's concerns increased over time owing to "the abundance of excuses" proffered by the Defendant for his failure to sell the diamond and pay the Plaintiff.

On November 30, 2011, the Plaintiff advised the Defendant that he either wanted the diamond returned to him or $8,000 that very day, although he testified that he had learned by then that the diamond was in the possession of a jeweler in Worcester, Massachusetts who had mounted it in a ring setting. The Plaintiff texted the following demand to the Defendant: "My office tomorrow 12pm 188 newton street Brighton. $8K and I'm not taking a $1 less [sic]."

The parties did not meet on December 1, 2011. Eventually, on December 3, 2011, they met in the parking lot of the International House of Pancakes on Soldiers Field Road in Brighton, Massachusetts. At that time, the Plaintiff presented the Defendant with an "Agreement for Consignment," which according to the Plaintiff, the Defendant willingly and confidently signed. The Agreement, which the Plaintiff drafted, provided the following:

> I, Karim J. Deghmane authorize and grant right to Hamo Tavitian of Hamo Jewelers or any other or future entity owned or ran by [sic] Hamo Tavitian to sell a loose VS2, E Clarity princess cut diamond (GIA Certification to be provided) to be placed under consignment for an agreed upon sale price of no less than $8000.00. The terms of the sales and consignment agreement are as follows:
>
> -Hamo Tavitan [sic] agrees to have the agreed upon amount of $8000.00 to be paid in full by no later than midnight March 1, 2011 [sic]

-A deposit of no less than $3000.00 is to be provided by no later than 11:59pm [sic] on December 31, 2011.

-Karim Deghmane grants Hamo Tavitian full autonomy in the sale of the diamond as he sees fit.

-Karim Deghmane will not question or request additional funds from Hamo Tavitian regardless of sales price or proceeds that Hamo Tavitian receives as a result of the sale of the diamond or any variation of [sic].

-Failure for [sic] Hamo Tavitian to either return the diamond in its original condition or violate the terms of this agreement will result in legal action against Hamo Taviatan [sic] and Karim Deghmane will seek the original purchase price of the diamond along with any damages and legal fees incurred in order to recoup any and all losses incurred.  Furthermore, Failure [sic] for [sic] Hamo Tavitian to meet the conditions of the agreement and is unable [sic] to return the diamond in its original condition will result in criminal action taken against Hamo Tavitian.

-If the diamond is mounted it will be deemed to no longer be in original condition [sic]

Both parties agree that the information provided is sworn under the pains and penalties of perjury.

The Plaintiff testified that at the time he executed the Agreement he believed that the Defendant "had already sold the diamond and kept the money." He also indicated he had provided the Defendant with the GIA certification for the diamond.

On December 26, 2011 and December 29, 2011, the Plaintiff texted the Defendant about a meeting to obtain the $3,000 deposit.  On December 29, 2011, the Defendant texted the Plaintiff that he would be at the Plaintiff's office at noon, stating "its definet" [sic]. The Defendant, however, did not show up to meet the Plaintiff on December 31, 2011. On January 2, 2012, the Plaintiff texted the Defendant the following:  "It's Monday Hamo?"  The Defendant responded to the text indicating that he would call the Plaintiff

in an hour.  In response, the Plaintiff texted:  "If I'm not getting my money today Hamo don't bother calling."  The Defendant then wrote the following:  "Don't think I am avoiding u wait few days I call u soon little difficulty thanks" [sic].

The Plaintiff ultimately contacted the Watertown police and then filed an application for a criminal complaint in the Waltham District Court on February 21, 2012. According to the Plaintiff, the court's clerk magistrate scheduled a hearing on the application for a criminal complaint which the Defendant attended.  Although an agreement was reached following the hearing pursuant to which the Defendant agreed to pay the Plaintiff the full amount owed, the Plaintiff testified that the Defendant never paid him any money before he commenced a civil action in the Cambridge District Court. Prior to filing a civil complaint in the Cambridge District Court, the Plaintiff caused a Ch. 93A demand letter to be sent to the Defendant, but received no response.  The Court takes judicial notice that in his Complaint, the Plaintiff represented the following:

> On July 18, 2012, the Plaintiff instituted a civil action, Docket Number 12-52CV-0533, in the Cambridge District Court seeking damages from the Debtor/Defendant under five (5) causes of action: for Breach of Contract, Quantum Meruit, M.G.L. c. 93A Violations of Unfair and Deceptive Business Practices, Conversion, and Breach of Implied Covenant of Good Faith and Fair Dealing.

On October 26, 2012, the Plaintiff in the civil action obtained a default judgment from the Cambridge District Court in the sum of $13,000 which sum was doubled.  As noted above, the judgment with interest, fees and costs, including attorney's fees, totaled $47,651.79.[3]

---

[3] The summons issued by the Cambridge District Court and served by the process server, identified the Defendant as having an address of 55 Waverly Avenue, Apt. 408 Watertown, MA.  The Defendant testified that he was living at 55 Waverly Avenue, Apt.

The Plaintiff commenced supplementary process proceedings with respect to collection of the judgment in the Waltham District Court.  The Defendant failed to appear. As a consequence, the court issued a capias and the Defendant was arrested and brought to the Waltham District Court which ordered him to make payments.  The Defendant paid $1,500 at the time of the hearing and was required to make payments of $300 per month, although he eventually defaulted, resulting in a further arrest.  At the time of the Defendant's second arrest, the Waltham District Court ordered the Defendant to continue making payments pursuant to the payment plan.  The Plaintiff testified that at the time of the second arrest, the Defendant paid him the amount outstanding under that plan, although additional payments became due.  According to the Plaintiff, the Defendant ultimately paid him a total of "[a]bout $10,000" including the $1,500 payment at the time of the Defendant's initial arrest.

The Plaintiff testified that he was willing to accept $8,000 for the diamond because he did not believe he would be able to obtain retail value for it, an opinion confirmed by the Defendant.  The Plaintiff added: "as to the reasons why I discounted it, I simply wanted to move on from it from whatever personal issues and connections I had with it."

---

704 Watertown, MA.  The return of service attached to the summons establishes that the process server left the "SUMMONS, COMPLAINT AND DEMAND FOR JURY TRIAL, STATEMENT OF DAMAGES, ALLOWED MOTION FOR EX PARTE APPROVAL OF ATTACHMENT BY TRUSTEE PROCESS, AFFIDAVIT OF KARIM J. DEGHMANE, AFFIDAVIT OF CARRIE DOUGLAS, ESQ. AND ALLOWED 4C MOTION" at 55 Waverly Avenue, Apt. 704 Watertown, MA."  The Defendant testified that he never received the summons and complaint, indicating that it was delivered to the residence of his former spouse who did not give him the documents.

He also testified that the Defendant always told him that he would give him the money once he had it, but never told him that he had sold the diamond.

The Defendant gave another version of the parties' agreement.  His recitation of events was difficult to comprehend as English is not his first language.  His syntax was irregular, and his testimony was marred by inconsistencies that cannot be attributed to a failure to fully comprehend the questions posed to him.  Indeed, the Defendant did not bring an interpreter to court for the trial, and the Court observed that the Defendant understood the questions addressed to him.  Nevertheless, the Defendant was unclear and evasive in his responses and his tone was often belligerent.  The Defendant was not a credible witness, particularly as his version of events was marked by inconsistencies.

The Defendant denied having serious financial problems at the time he agreed to sell the diamond for the Plaintiff.  He testified that the Plaintiff gave him the diamond and that he sold it, adding that he never received any money from the person to whom he sold it.  Later in his testimony, he stated that he received $2,000 from the individual who tried to sell the diamond for him but never obtained the balance of the purchase price.

The Defendant's sworn testimony at the section 341 meeting of creditors was markedly different.  At the meeting, he testified that he sold the diamond to "[a] friend, a customer friend of mine from New York" and then that he sold the diamond to a "guy from New York" for $8,000 in cash, adding "[h]e paid me 2,000 and he paid me another 3,000.  He paid me payment plan" over five or six months.   In addition, the following

colloquy took place between the Chapter 7 Trustee and the Defendant at the section 341,

meeting:

> TRUSTEE BUTLER: Okay, So over some period of time, though, he paid
> you $8,000.
> MR. TAVITIAN: Yes.
> TRUSTEE BUTLER: Did you ever pay any of it to his client? The 8,000?
> MR. TAVITIAN: The payment, no.  I told him give me two months, three
> months, and he says no problem.  Then they tried to do, sue me and a court
> order came into the, some courthouse in Boston. No Boston. Cambridge. . .

That testimony was contrary to his trial testimony when he elaborated upon the sale of

the diamond, testifying as follows:

> I never sold it myself. I -- two friend of mine from Worcester, he was a
> jeweler. He came to [D]owntown [C]rossing.  I gave it to him so he can try
> to get -- see it -- sell for customers if they have it. But Mr. Deghmane, he
> asked me, "Take your time. Whatever you can get. No timing zone."
>
> <div align="center">***</div>
>
> The guy -- the guy's name is Djohn (phonetic) from Worcester. His name
> was John to some other jewelers I met. As a trust, I give it to him so he can
> try to sell it to – to anybody, then he's going to let me know as a jeweler.

The Defendant testified that he never met John and did not know his last name.  The

Defendant then indicated that he gave the diamond to an individual named Sam Nicholas

("Nicholas") who sold it to John.  Nicholas was to "take care of the diamond" for him.

The Defendant added that he had no idea if Nicholas was paid for the diamond but that

Nicholas gave him $2,000.

The Defendant further testified that he did not have a certification for the

diamond, adding that the diamond was an "[o]kay diamond" and that a princess cut was

harder to sell than other cuts.  He contradicted the Plaintiff's testimony about the

salability of the diamond and stated that the Plaintiff forced him to sign the Consignment

Agreement.  In addition, he testified that although he agreed to a payment plan after appearing before the magistrate and paying the Defendant $1,500, he never understood that he would have to pay approximately $47,000 rather than $8,000.  He also testified that he never attempted to have the default judgment removed in the Cambridge District Court and that he paid the Plaintiff around $13,000 in total, adding that that sum was more than the value of the diamond.  Other than his testimony, the Defendant produced no evidence of what he paid the Plaintiff.

The Defendant claimed he paid the Plaintiff $3,000 in cash in mid-February of 2012, comprised in part from the $2,000 given to him by Nicholas before the commencement of the Cambridge District Court action, reiterating that he paid the Plaintiff $1,500 at the time of a hearing in Waltham District Court and entered into a $300 per month payment plan.

The Defendant explained that he attempted to sell the diamond to another jeweler in Boston for several months.  In the presence of a friend in the jewelry business named James Tyre, the Defendant eventually gave the diamond to Nicholas, a dealer originally from New York, whom the Defendant testified was no longer in business.  The Defendant informed Nicholas that he wanted $9,000-$9,500 for the diamond.  The Defendant admitted that he did not tell the Plaintiff that he had entrusted the diamond to Nicholas.  According to the Defendant, Nicholas told him he would try to sell the diamond and pay him within a week.  The Defendant reiterated his testimony that he received $2,000 around that time when the diamond was mounted in a ring setting and given to a retailer.  According to the Defendant, Nicholas "makes stories to me, to John."

11

The Defendant testified that he wanted to sell the diamond for the Plaintiff, but he also indicated the Plaintiff's harangues about the return of the diamond or payment of the proceeds amounted to bullying. The Defendant expressed his frustration that he was required to satisfy a judgment in excess of the $8,000 the Plaintiff initially wanted from the sale of the diamond.

The Plaintiff denied ever receiving $3,000 in cash from the Defendant, insisting that the only payments he received were in the form of money orders. In addition, he disputed the testimony that the Defendant informed him that a princess cut diamond would be harder to sell than a round cut diamond. Rather, he testified that the Defendant told him the princess cut was quite popular. Nevertheless, he admitted that he received approximately $10,000 in total from the Defendant.

Neither party provided an account of how much was paid or received. The Court finds the credible evidence is that the Defendant paid the Plaintiff $10,000.

**IV. DISCUSSION**

A. Principles Applicable to Counts under 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6)

The United States Court of Appeals for the First Circuit in Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir.1997), emphasized "the Bankruptcy Code's 'fresh start'" policy," stating that "[e]xceptions to discharge are narrowly construed." Id. at 786. To prevail in an adversary proceeding brought under 11 U.S.C. § 523(a), the Plaintiff must prove each and every element of an exception to discharge by a preponderance of the evidence. See Grogan v. Garner, 498 U.S. 279, 286 (1991). Accordingly, "the claimant must show that his 'claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a).'"

12

Palmacci v. Umpierrez, 121 F.3d at 786 (quoting Century 21 Balfour Real Estate v. Menna

(In re Menna), 16 F.3d 7, 9 (1st Cir.1994), *overruled on other grounds by* Field v. Mans, 516

U.S. 59, 70–71 (1995)).

    B. Section 523(a)(2)(A)

    Pursuant to 11 U.S.C. § 523(a)(2)(A), a debt "for money, property, services, or an

extension, renewal, or refinancing of credit" is excepted from discharge "to the extent

obtained by . . . false pretenses, a false representation, or actual fraud. . . ."  In McCrory

v. Spigel (In re Spigel), 260 F.3d 27 (1st Cir. 2001), the United States Court of Appeals for

the First Circuit set forth six factors that a plaintiff must establish to obtain a

determination that a debt will be excepted from discharge owing to false pretenses, false

representation, or actual fraud:

> (1) the debtor made a knowingly false representation or one made in reckless disregard of the truth;
> (2) the debtor intended to deceive;
> (3) the debtor intended to induce the creditor to rely upon the false statement;
> (4) the creditor actually relied upon the misrepresentation;
> (5) the creditor's reliance was justifiable; and
> (6) the reliance upon the false statement caused damage.

McCrory v. Spigel (In re Spigel), 260 F.3d at 32 (footnote omitted); *see also* Palmacci v.

Umpierrez, 121 F.3d at 786.  The first two elements of the test describe the conduct and

scienter required to show fraudulent conduct, while the last four elements embody the

requirement the creditor's claim must arise directly from the debtor's fraud.  Id.

    The Court concludes that the Plaintiff failed in his burden of establishing that the

Defendant knowingly made a false representation or intended to deceive the Plaintiff at

the very outset of their relationship when the Plaintiff delivered the diamond to the Defendant to sell.  There was a dearth of evidence that the Defendant, at the outset of the parties' relationship, intended to induce the Plaintiff to relinquish the diamond so that he could obtain it, sell it, and retain the proceeds for himself.  Rather, the Court concludes that the Defendant grossly overestimated his capacity to engineer a quick sale of the diamond and, thereafter, sold or entrusted the diamond to Nicholas or another "friend" in the jewelry business to sell on his behalf.  After a lapse of time, the Defendant then failed to return the diamond or deliver proceeds from its sale to the Plaintiff and engaged in deceptive conduct designed to thwart the Plaintiff who was insisting that he be paid or the diamond returned.  Accordingly, the Plaintiff failed to prove each and every element of a claim under section 523(a)(2)(A).

C. <u>Section 523(a)(4)</u>

Section 523(a)(4) excepts from discharge "any debt— . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny."  11 U.S.C. § 523(a)(4).  The Plaintiff relies upon a theory of embezzlement as neither the parties' initial oral agreement nor the Consignment Agreement created an express trust or imposed fiduciary duties on the Defendant pertinent to proof of fraud while acting in a fiduciary capacity.

The United States Court of Appeals for the First Circuit in <u>Sherman v. Potapov (In re Sherman)</u>, 603 F.3d 11, 13 (1st Cir. 2010), relying upon the common law definition of embezzlement and citing, inter alia, <u>Neder v. United States</u>, 527 U.S. 1, 23 (1999), and

United States v. Young, 955 F.2d 99, 102 (1st Cir. 1992), defined embezzlement for

purposes of the exception to discharge under section 523(a)(4) as follows:

> Embezzlement is "the fraudulent conversion of the property of another by
> one who is already in lawful possession of it." Thus, to amount to
> embezzlement, conversion must be committed by a perpetrator with
> fraudulent intent . . . . It is knowledge that the use is devoid of authorization,
> scienter for short, that makes the conversion fraudulent and thus
> embezzlement.

In re Sherman, 603 F.3d at 13 (citations omitted).  See also Bullock v. BankChampaign,

N.A., 569 U.S. 267, 274 (2013) ("embezzlement requires a showing of wrongful intent").

Embezzlement does not require the existence of a fiduciary relationship, Matthews

v. Nealon (In re Nealon), 532 B.R. 412, 424 (Bankr. D. Mass. 2015) (citing Farley v. Romano

(In re Romano), 353 B.R. 738, 765 (Bankr. D. Mass. 2006)), but it does require proof that

"'(i) property in the perpetrator's lawful possession but (ii) belonging to another (iii) was

appropriated by the perpetrator in a manner inconsistent with the property rights of the

other and the scope of his or her authorization to deal with the property (iv) with

fraudulent intent.'" In re Nealon, 532 B.R. at 424 (citing, inter alia, Lento v. Marshall (In

re Marshall), 497 B.R. 3, 12 (Bankr. D. Mass. 2013), and Lacourse Builders, LLC v.

D'Anello (In re D'Anello), 477 B.R. 13, 26 (Bankr. D. Mass. 2012)).  See also Gazzola v.

Brandt (In re Brandt), 565 B.R. 472, 483 (Bankr. D. Mass. 2017).

In Lento v. Marshall (In re Marshall), 497 B.R. 3 (Bankr. D. Mass. 2013), the court

considered a claim that the debtor embezzled proceeds of consigned goods.  The court

explained what constitutes a consignment, stating:

> In a true consignment, the owner of goods (the "consignor") delivers
> possession to a bailee (the "consignee") who is given the power to sell the

goods to customers. The consignor retains title of the goods until they are sold to the ultimate buyer, and then the consignee remits a portion of the price to the consignor. The consignee is free to return any unsold goods to the consignor. A true consignment is distinguishable from a sale-or-return transaction, in which title is transferred to a buyer upon delivery but the buyer has a contractual right to return the goods; in a true consignment, there is neither a present sale nor a buyer.

Id. at 13 (citing, inter alia Mass. Gen. Law ch. 106, § 9–109 cmt. 6) (footnotes omitted).  In Marshall, the court determined that a consignment agreement existed, that the proceeds of the consigned goods belonged to the plaintiff and were appropriated with fraudulent intent by the defendant/debtor, and that judgment should enter in favor of the plaintiff under 11 U.S.C. § 523(a)(4).

This Court concludes that the parties in this adversary proceeding intended a true consignment and, as the court recognized in Marshall, "because the parties' relationship remained a consignment relationship in which the Plaintiff retained title to the Collateral, the proceeds from their sale became the Plaintiff's property as well." Id. at 14.  The Court further concludes that the Defendant embezzled proceeds from the sale of the diamond.

Because the Defendant's testimony was both inconsistent at trial and with his testimony at the section 341 meeting of creditors, and was ultimately incredible as well, the Court determines that the Defendant did sell the diamond for $8,000 and failed to remit the proceeds to the Plaintiff with wrongful intent.  Although the Defendant eventually paid the Plaintiff in excess of $10,000, he did not do so until he was arrested on a capias and appeared before the clerk magistrate in the Waltham District Court.  In sum, the diamond was in the rightful possession of the Defendant, the Defendant was authorized to sell the diamond and remit the proceeds to the Plaintiff, and the Defendant

appropriated the proceeds from the sale with fraudulent intent.  Whether the Defendant

obtained money for the diamond in one lump sum or over a period of time, he was

unauthorized to retain funds for his own use.  His failure to keep the Plaintiff apprised

of his dealings with jewelers from Boston, Worcester, or New York, his failure to respond

to discovery in this proceeding, and his failure to testify consistently under oath at the

section 341 meeting of creditors and at trial, all provide compelling evidence of his

fraudulent intent.  Moreover, "[i]n the context of consignments, several courts have found

that fraudulent intent may be inferred when the debtor has an affirmative duty to remit

sale proceeds to a certain creditor but fails to do so."  In re Marshall, 497 B.R. at 14 (citing

Hall v. Blanton (In re Blanton), 149 B.R. 393, 394 (Bankr. E.D. Va. 1992); Moonan v.

Bevilacqua (In re Bevilacqua), 53 B.R. 331, 334 (Bankr. S.D.N.Y. 1985); Chrysler Credit

Corporation v. Freeman (In re Freeman), 30 B.R. 704, 708 (Bankr.W.D.La.1983); Applegate

v. Shuler (In re Shuler), 20 B.R. 163 (Bankr. D. Idaho 1982)).

D. Section 523(a)(6)

As the court in USAlliance Fed. Credit Union v. Reale (In re Reale), 580 B.R. 579

(Bankr. D. Mass. 2018), recently observed:

> In order for an injury to be willful, the debtor must have intended to cause
> the injury or have been substantially certain that an injury would result.
> Kawaauhau v. Geiger, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).
> It is not enough that a debtor intend the act which leads to the injury, even
> if the debtor was negligent or reckless in performing the act. Id. at 63, 118
> S.Ct. 974. To establish that the injury was malicious, the injury must be
> "wrongful," "without just cause or excuse," and "committed   . . . in
> conscious disregard of one's duties." Printy v. Dean Witter Reynolds, Inc.,
> 110 F.3d 853, 859 (1st Cir. 1997).

In re Reale, 580 B.R. at 588.   A conversion of property may constitute a willful and malicious injury.  *See* Reed v. Zak (In re Zak), 573 B.R. 13, 42 (Bankr. D. Mass. 2017).   In Zak, this Court observed:

> In Massachusetts, the tort of conversion "requires the exercise of dominion or control over personal property of another." *See* Third Nat'l Bank v. Continental Ins. Co., 388 Mass. 240, 244, 446 N.E.2d 380 (Mass. 1983); *see also* Evergreen Marine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d 90, 95 (1st Cir. 1993) (discussing the elements of conversion under Massachusetts law); Gen. Elec. Co. Bus. Lighting Group v. Halmar Distributors, Inc. (In re Halmar Distributors, Inc.), 232 B.R. 18, 22 (Bankr. D. Mass. 1999) ("Conversion is the wrongful exercise of dominion or control over the personal property, including money, of another."); Morrin v. Manning, 205 Mass. 205, 211, 91 N.E. 308 (1910) (money may be the subject of conversion).

In re Zak, 573 B.R. at 41 (quoting deBenedictis v. Dougherty (In re Dougherty), 509 B.R. 757, 769 (Bankr. D. Mass. 2014), *aff'd sub nom.* deBenedictis v. Dougherty, No. CV 14-12139-GAO, 2015 WL 4480724 (D. Mass. July 22, 2015)).[4]  The court further noted:

> Not all acts of conversion constitute a willful and malicious injury to property for the purpose of § 523(a)(6). Davis v. Aetna Acceptance Co., 293 U.S. 328, 331–32, 55 S.Ct. 151, 79 L.Ed. 393 (1934) (decided under former Bankruptcy Act of 1898). The Supreme Court in Davis stated:

---

[4] According the First Circuit Court of Appeals in Evergreen Marine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d 90 (1st Cir. 1994), a case cited by this Court in Zak,

> A plaintiff asserting a conversion claim under Massachusetts law must show that: (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

Id. at 95 (footnote and citations omitted).

> [A] willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.

> Davis, 293 U.S. at 332, 55 S.Ct. 151 (internal citations omitted). *See also* Ocean Equity Group v. Wooten (In re Wooten), 423 B.R. 108, 132 (Bankr. E.D. Va. 2010) ("Cases subsequent to Geiger that have considered whether acts of conversion constitute willful and malicious injury focus on the distinction between whether the conversion was an intentional one or merely a reckless or negligent conversion of property.").

In re Zak, 573 B.R. at 42.  Thus, to except a debt under section 523(a)(6), the Plaintiff was required to establish that the Defendant did some positive wrongful act with the intention of appropriating the diamond or its proceeds to himself.  Id.  (citing Kelley v. LaForce, 288 F.3d 1, 11–12 (1st Cir. 2002), and Hancock v. Caliri (In re Caliri), 335 B.R. 2, 13 (Bankr. D. Mass. 2005)).

This Court concludes that the Plaintiff established that the Defendant converted proceeds from the sale of the diamond by intentionally depriving the Plaintiff of the diamond and by failing to remit proceeds from its sale.  The Defendant's testimony about the circumstance surrounding his attempts to sell the diamond was contradictory, and he failed to adequately apprise the Plaintiff of his sales efforts.  His failure to communicate with the Plaintiff compels the conclusion that he was concealing from the Plaintiff the whereabouts of the diamond as well as the amount he received from its eventual sale.  His inconsistent testimony both at the section 341 meeting and at trial also compels the

conclusion that he had a wrongful purpose and was acting without just cause or excuse. If the Defendant relinquished possession of the diamond to "a friend" and was himself hoodwinked, he should have conveyed that information to the Plaintiff and offered to remit $8,000 to him through a payment plan.  Instead, the Defendant chose to ignore the urgency of the Plaintiff's concerns, failed to answer the state court complaint which was delivered to his residence with the summons, and only paid the Plaintiff after he was arrested on a capias.  Accordingly, the Court concludes that the Plaintiff sustained his burden under section 523(a)(6).

E. Ch. 93A and Damages

In Cohen v. de la Cruz, 523 U.S. 213 (1998), the Supreme Court interpreted the words "any debt," in the context of an exception to discharge under section 523(a) to apply to any debt which arises from the debtor's act in obtaining specific money or property by fraud under section 523(a)(2)(A).  Id. at 218.  The Supreme Court specifically refused to limit a debt for money or property obtained by fraud to the value of the money or property received by the debtor, upholding the bankruptcy court's award of attorneys' fees and treble damages under state law.  Id.

In Adamo v. Scheller (In re Scheller), 265 B.R. 39, 55 (Bankr. S.D.N.Y. 2001), the court addressed whether the holding in Cohen v. de la Cruz applied to the exceptions to discharge under section 523(a)(4) and section 523(a)(6).  It observed the following: "Cohen v. de la Cruz, therefore, stands for the proposition that where attorneys' fees are available outside bankruptcy as a matter of law, then they are available inside bankruptcy in a dischargeability proceeding as well." Id. at 55 (citing Buffalo GYN Womenservices,

Inc. v. Behn (In re Behn), 245 B.R. 444, 447 (Bankr. W.D.N.Y. 2000)).  In Scheller, the court

determined that the debtor's debt to the plaintiff was nondischargeable under section

523(a)(4) and excepted from the debtor's discharge the full amount of a judgment that

included actual damages, attorney's fees, costs and punitive damages.   In that case,

however, a default was not entered against the defendant in the state court action as the

defendant appeared in the state court proceeding and defended the plaintiff's action.  The

bankruptcy court applied de la Cruz and principles of collateral estoppel to except the

plaintiff's debt from discharge in the total amount of the state court judgment.   The

instant case, however, is distinguishable from Scheller because here the Plaintiff obtained

a default judgment that included double damages, costs and attorney's fees.

In Backlund v. Stanley-Snow (In re Stanley-Snow), 405 B.R. 11 (B.A.P. 1st Cir.

2009), the United States Bankruptcy Appellate Panel of the First Circuit set forth legal

principles regarding application of collateral estoppel.   It concluded that the doctrine of

collateral estoppel applies in dischargeability proceedings and that the laws of the state

in which the action is pending governs application of collateral estoppel.  Id. at 18.  The

court added:

> Under Massachusetts law, collateral estoppel precludes relitigation of
> issues in prior actions between the parties or those in privity with those
> parties, provided the issues were actually litigated in the first action, and
> determined by a "final judgment on the merits." Smith Barney, Inc. v.
> Strangie (In re Strangie), 192 F.3d 192, 194 (1st Cir. 1999). To apply the
> doctrine, a court must determine that: (1) there was a valid and final
> judgment on the merits in the prior adjudication; (2) the party against
> whom estoppel is asserted was a party (or in privity with a party) to the
> prior litigation; (3) the issue in the prior adjudication is identical to the issue
> in the current litigation; and (4) the issue in the prior litigation was essential
> to the earlier judgment. Alba v. Raytheon Co., 441 Mass. 836, 809 N.E.2d

516, 521 (2004) (citations omitted). The Supreme Judicial Court of
Massachusetts has noted that "the 'guiding principle' in determining
whether to allow a party to use collateral estoppel is whether the party
against whom it is asserted had a 'full and fair opportunity to litigate the
issue in the first action or [whether] other circumstances justify affording
him an opportunity to relitigate the issue.'" Treglia v. MacDonald, 430
Mass. 237, 717 N.E.2d 249, 253 (1999) (quoting Martin v. Ring, 401 Mass. 59,
514 N.E.2d 663 (1987)).

In re Stanley-Snow, 405 B.R. at 18. The bankruptcy appellate panel also observed that it

is within a court's discretion to apply collateral estoppel to a default judgment. Id. at 19

(citing Int'l Strategies Group, Ltd. v. Pomeroy (In re Pomeroy), 353 B.R. 371, 376 (Bankr.

D. Mass. 2006)). It added that "[i]n Massachusetts, however, default judgments are

generally not given collateral estoppel effect on an issue in a subsequent action because

the issues have not been actually litigated. Id. (citations omitted). The court observed that

the Supreme Judicial Court of Massachusetts has recognized some exceptions to the

general rule that following a default judgment an issue is not given preclusive effect in

subsequent litigation between the same parties. It stated:

> We can, for example, envision circumstances in which a litigant may so
> utilize our court system in pretrial procedures, but nonetheless be defaulted
> for some reason, that the principle and rationale behind collateral estoppel
> would apply. See, e.g., Matter of Gober, 100 F.3d 1195 (5th Cir. 1996)
> (holding that default judgment based on failure to answer does not support
> issue preclusion but where default issued as discovery sanction against
> defendant debtor after two years of litigation in which defendant had
> answered and denied all allegations of complaint, collateral estoppel
> applied); In re Bush, 62 F.3d 1319, 1324 (11th Cir.1995) (applying collateral
> estoppel effect to prior default judgment against debtor based on fraud,
> where debtor "actively participated" in adversary process for almost one
> year through filing answer, counterclaim, and discovery requests).

In re Stanley-Snow, 405 B.R. at 19 (quoting Treglia v. McDonald, 430 Mass. 237, 242, 717

N.E.2d 253, 254 (1999)). The court also noted that federal courts also recognize exceptions

to the general rule requiring "actual litigation" where a party actively or substantially participated in the proceedings prior to the entry of a default judgment. In re Stanley-Snow, 405 B.R. at 19 (citations omitted).

"When applying issue preclusion to damage awards, courts are careful to ensure that all damages arise solely from the prohibited § 523(a) conduct." Murphy v. Spencer (In re Spencer), No. 15-10595 TF7, 2016 WL 1556033, at *4 (Bankr. D. N.M. Apr. 14, 2016) (citing, inter alia, Jendusa–Nicolai v. Larsen, 677 F.3d 320, 322 (7th Cir.2012) (punitive damages and damages for loss of consortium were nondischargeable under § 523(a)(6) because they were "derivative from the injury that the debtor committed intentionally")). Nevertheless, the court in Spencer recognized that "[i]ssue preclusion typically is not applied where multiple theories are asserted and the damages cannot be traced to any § 523(a) claims." In re Spencer, 2016 WL 1556033, at *4 (citations omitted).

As noted above, the Plaintiff did not introduce into evidence a copy of his state court complaint in which he asserted multiple theories of recovery. In addition, he did not introduce a copy of any Ch. 93A demand letter sent to the Defendant prior to the commencement of the civil action. In addition, there was no evidence that the Defendant participated in the state court action to warrant departure from the general rule that default judgments are not given collateral estoppel effect. The Plaintiff, in his state court complaint, indicated that he sought damages under multiple theories, including breach of contract, Chapter 93A, and conversion. Accordingly, it is impossible to attribute the award of double damages, costs and fees to any particular count of his state court complaint, such as conversion. As the court recognized in Harb v. Toscano (In re

Toscano), 23 B.R. 736 (Bankr. D. Mass. 1982), "[b]ecause it would be possible under the same set of facts to find a violation of Chapter 93A for misconduct which lacks the elements of non-dischargeability, the principle of collateral estoppel does not operate to render a Chapter 93A judgment non-dischargeable.  Id. at 740 (citing Commonwealth v. Hale, 618 F.2d 143, 146-48 (1st Cir. 1980)).   In other words, this Court cannot trace the award of double damages, costs and attorney's fees to the Plaintiff's claims under section 523(a)(4) or (a)(6) on the existing record, and the Plaintiff failed to prove a claim under Ch. 93A as he failed to submit as an exhibit a copy of the Ch. 93A demand letter sent to the Defendant.  See generally Da Silva v. U.S. Bank, N.A., 885 F. Supp. 2d 500, 505 (D. Mass. 2012) ("When bringing a claim for a violation of Chapter 93A, the party seeking relief must present the other party with a written demand for relief at least thirty days before filing a suit. The demand letter is a condition precedent to filing suit." (footnotes omitted)).  Accordingly, neither collateral estoppel nor the principles set forth in Cohen v. de la Cruz permit this Court to enter a judgment in the amount of the default judgment entered by the Cambridge District Court which included an award of multiple damages, costs, and attorneys fees.

To the extent that the Plaintiff seeks a determination that his Ch. 93A claim for damages is excepted from discharge, the Court concludes that any conduct that violates Ch. 93A must be such that it would be excepted from discharge under either section 523(a)(2)(A), (a)(4) or (a)(6).  As this Court has determined that the Plaintiff proved that the debt arising from the Debtor's conduct is excepted from discharge under 11 U.S.C. § 523(a)(4) and (a)(6) (i.e, Counts II and III), the Court shall not address Count VI as the

24

Plaintiff introduced no evidence that the double damages awarded to the Plaintiff were tied to the only potentially nondischargeable claim set forth in the state court complaint, i.e., conversion. Because any claim for damages under Ch. 93A that does not fall within the scope of section 523(c), the Plaintiff failed in his burden of establishing that his state court judgment which included double damages, attorney's fees and costs is not excepted from discharge.

## V. CONCLUSION

In accordance with the foregoing, the Court shall enter a judgment in the amount of $3,660.50 on Count II and III, representing the difference between what the Plaintiff paid for the diamond, less $10,000 that the Defendant paid the Plaintiff. The Court shall enter judgment in favor of the Defendant and against the Plaintiff on Counts I and VI.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  June 19, 2018